**STATE of Missouri, Respondent,**

v.

**Theodore L. IRVING II, et al., Appellants.**

**No. WD 36807.**

Missouri Court of Appeals,
Western District.

Nov. 12, 1985.

Kent W. Minton of counsel, Raymond, Raymond & Owens, Kansas City, for appellants.

Albert A. Riederer, Pros. Atty., Robert Frager, Asst. Pros. Atty., Kansas City, for respondent.

Before MANFORD, P.J., and PRITCHARD and LOWENSTEIN, JJ.

PRITCHARD, Judge.

Pursuant to the provisions of § 567.080.-2. RSMo 1978, plaintiff filed its first amended petition to enjoin defendants Theodore Irving II, d/b/a Gentlemen's Quarters, Inc. and VIP Health Studio; Juanita Irving and Christopher J. Irving, d/b/a VIP Health Studio; and David Jackson, from conducting an alleged public nuisance in "providing sexual contact for pay and/or unlawful prostitution activity" on premises located at 8603 Truman Road, Blue Summit, Jackson County, Missouri. After hearing, the court granted a permanent injunction for one year from November 28, 1984.

Lawrence Berkland, a private investigator who was contacted by the Platte Coun-

ty Sheriff's office, went to the massage parlor and arranged for its services as follows: On March 7, 1984, he paid $100 for a massage from June Hardwick, during which she contacted his genitals with her hand; on March 12, 1984, he paid $100 for a massage from Irene Riley who contacted his genitals with her hand; on March 14, 1984, he paid $100 to Nancy Sobaski for a massage who contacted his genitals with her hand; on May 18, 1984, Annette Buentello performed a massage, including Berkland's genitals, for $80; on June 7, 1984, Berkland paid $100 to Jean McMasters for a massage, during which she placed her vaginal area over his buttocks. According to Berkland, the contact by the women with his genitals lasted from 10 to 20 minutes each time. The girls were nude each time.

Mike Staihr, a patron of the massage parlor, obtained eight massages during the spring of 1984, and on each of the occasions both he and the masseuse were nude, and the massage included contact with his genitals.

Carolyn Duncan testified for the plaintiff under a promise of immunity from prosecution on charges of prostitution. She acknowledged on cross-examination that she had engaged in 50 or 60 acts of prostitution while she was present at the subject massage parlor. Carolyn received training from Charlene (Tessie) Kennedy in April, 1984, who was an operator also. Tessie showed her how to do different types of massage with a customer, both women and the customer being nude. Tessie motioned toward the customer's genital area, which Carolyn then massaged. Both Tessie and Joan Rymus told Carolyn there was nothing illegal about that act, which was given 99% of the time. Carolyn and the other women kept tally sheets of receipts, dividing 60% to Theodore Irving, and 40% to each operator, and the receipts were dropped into a safe slot at the end of each day. The record does not show how the women received their percentage of the take, but defendant, Juanita Irving, took the receipts from the safe each day.

On May 4, 1984, the Assistant Prosecuting Attorney sent letters by certified mail to Joan G. Rymus (manager), Juanita Irving, and Theodore Irving, II (owners). The letters informed that it had come to the attention of the office that employees of the VIP Health Studio had been there engaging in acts of sexual contact for money in violation of §§ 567.010 through 567.100, RSMo 1978, and that under § 567.080, "if the owner or his agent knows or should have known of the regular use of his premises for prostitution and takes no action to abate the nuisance, he may lose the use of the premises for up to one year. Consequently, unless you take immediate action to insure that this type of activity ceases, it will be the obligation of this office to institute legal proceedings to have the property declared a public nuisance and we will seek an injunction ordering that the premises not be used or occupied by anyone for one year."

Shortly after the letters were received, a meeting was held in the lobby of the VIP, at which four or five of the operators who worked there, Joan Rymus and her daughter, Charlene Kennedy, and defendants' counsel were present. Carolyn Duncan was asked to sign affidavits, as were the other operators, which "Basically said that you're not committing the act of prostitution, I don't intend to commit an act of prostitution, and you never have committed an act of prostitution." Upon refusing to sign her affidavit, Carolyn had quit. There was some discussion of masturbation and whether it was a criminal act. On May 29, 1984, defendants' counsel sent a letter to the Assistant Prosecuting Attorney informing that as a result of her correspondence and in an effort to correct alleged misconduct, all present licensees of the VIP Studio have been requested and have complied with executing the enclosed affidavits; furthermore, a process of polygraph examinations has existed for a period of years directed toward discovering any offensive misconduct. [According to the record, no polygraph examinations were administered after the May 4, 1984, letter.] The letter further informed that no miscon-

duct had been discovered, and requested identification of the person or persons engaged in "acts of sexual contact for money" which would allow the eradication of such improper conduct or contact to insure that improper activity ceases.

The affidavits of May 14, 1984, in the legal file state that each affiant is an independent contractor; that each has been informed as to acts which constitute violations of Chapter 567; and that each affiant has been informed by VIP that no such conduct or offer of conduct is to occur between affiant and a customer and should such conduct occur or offer to occur and be discovered by VIP, its relationship between it and affiant will be terminated and the violation would be reported to the Jackson County Sheriff. Each further represented that he/she had not been engaged in any of the (prohibited) activities since contracting with VIP to the present date.

Thereafter, on June 25, 1984, the application for temporary restraining order was filed, and after hearing, it was issued on November 29, 1984. On January 4, 1985, a hearing was had on the issuance of a permanent injunction, and on January 18, 1985, it was issued enjoining defendants or anyone from occupying or using the premises until November 28, 1985, which was later amended to include the legal description of the premises.

■ Defendants' first point is that the trial court erred in ordering the premises closed from November 28, 1984, for one year, when, as they say, the premises had been closed since June 6, 1984. Apparently the earlier closure was the result of a police raid. In any event, there was no court action ordering that earlier closure. The statute, § 567.080. 2., speaks of a *finding by the court* that the owner knew or had *reason to know that the premises were* being used for prohibited sexual contact, and that finding must relate to the facts as they existed at the time of trial. The first point is without merit, and is overruled.

■ In Point II, defendants say that there was no competent and substantial

evidence that Theodore Irving II, Juanita Irving and Chris Irving knew or had reason to know that sexual contact for pay and/or unlawful prostitution was occurring at the VIP, and the court therefore erred in so finding.

Section 567.080 provides: "1. Any room, building or other structure regularly used for sexual contact for pay as defined in section 567.010 or any unlawful prostitution activity prohibited by this chapter is a public nuisance. 2. The attorney general, circuit attorney or prosecuting attorney may, *in addition to all criminal sanctions,* prosecute a suit in equity to enjoin the nuisance. If the court finds that the owner of the room, building or structure knew or had reason to believe that the premises were being used regularly for sexual contact for pay or unlawful prostitution activity, the court may order that the premises shall not be occupied or used for such period as the court may determine, not to exceed one year. 3. All persons, including owners, lessees, officers, agents, inmates or employees, aiding or facilitating such a nuisance may be made defendants in any suit to enjoin the nuisance, and they may be enjoined from engaging in any sexual contact for pay or unlawful prostitution activity anywhere within the jurisdiction of the court. 4. Appeals shall be allowed from the judgment of the court as in other civil actions."

Section 567.010(4) states: " 'Sexual conduct' occurs where there is (c) 'Sexual contact' which means any touching, manual or otherwise, of the anus or genitals of one person by another, done for the purpose of arousing or gratifying sexual desire of either party."

The comment following § 567.080 states, "The prosecutor does not have to establish that the possessor knew his premises were being used regularly for sexual contact for pay or unlawful prostitution activities to deprive him of the use of his premises. If the owner should have known of the regular use of his premises for prostitution, he may lose the use of the premises for up to one year for failing to abate the nuisance.

A prosecutor could provide a basis for showing knowledge or that the landlord should have known of the prostitution by giving written notice to the landlord. This should be sufficient to get most landlords to abate the nuisance in view of the possible penalty if it is not abated." [Note that this comment, in its latter portion does not include "sexual contact", but mentions only prostitution, which under § 567.010(2), is defined as engaging, or offering or agreeing to engage in sexual conduct with another person in return for something of value.]

The significant facts here are that on May 4, 1984, the prosecutor mailed notices to Rymus and defendants that there were violations of §§ 567.010 through 567.100 by reason of acts of sexual contact engaged in on the premises of VIP Health Studio. Thereafter, there was a meeting among the operators and defendants' counsel, which produced the above mentioned affidavits of the operators, and the letter from defendants' counsel. Yet, despite the assertions of the affiants, according to the testimony of Berkland, *after* the May 4, 1984 notice, two incidents of sexual contact occurred. Thus, it appears that after notice, and being given the opportunity to do so, the nuisance was not abated by defendants, as the trial court could have found, and did. Thus, that alone was a sufficient basis for the trial court to issue its injunction for the one year duration.

But the continued acts of sexual contact, without abatement by defendants, is not all of the evidence in the case. Defendant, Theodore Irving II, acknowledged at trial that his net income from the VIP operation was $60,000 per year, with a gross income of $150,000 to $200,000 per year. The record does not reflect whether the gross income included the percentages, about 40%, due the massage operators, so perhaps that gross income would be increased by those percentages. In addition, Sheriff's Corporal Paul Campbell testified that in the course of his employment as an investigator, he had talked to members of the community and discussed with them the reputation of the massage parlor, and

that such reputation was that "you can go to the VIP and be masturbated, and it was the same reputation in 1982, 1983 and 1984." The two elements of sizeable income and widespread reputation of the business were found to support the trial court's finding that the appellant was fully aware of what the premises were being used for in *People v. Perez*, 192 Colo. 562, 561 P.2d 7, 10[4] (banc 1977), a massage parlor case involving prostitution. The fact of the prosecutor's letter of notice, coupled with the evidence of substantial income, and that of VIP's reputation, supply the element of defendant's awareness of the illegal and nuisance activities on the premises. Point II is overruled, as is Point III contending that there was no evidence that Theodore Irving II, Juanita Irving or Chris Irving knew or had reason to believe that sexual contact for pay and/or unlawful prostitution was occurring on the premises.

■ Defendants next complain of the trial court's sustaining of an objection on the ground of irrelevancy to the testimony of Michael Wee relating to a telephone call between him and defendants' counsel on June 6, 1984. Mr. Wee was then an assistant prosecuting attorney. It is said that his statements were admissions against the state's interest in that they showed that it had no evidence of any specific acts of illegal sexual contact which is required by the statute before an injunction may be issued, and that it showed defendants were taking every reasonable step (per the operators' affidavits, supra) to abate an alleged nuisance caused by a third party. It is doubtful that Mr. Wee's admissions, if they were such, are admissible against the state. He was a warrant officer, and Assistant Prosecutor Parker, with whom he had talked, was in charge of this case. It seems clear that the state had evidence, through its investigator, Berkland, that prohibited acts were occurring on the premises, and his testimony shows that they continued after the state's notice letters.

**534**

Under all of the circumstances, the trial court did not err in sustaining the objection to Mr. Wee's testimony upon the ground of irrelevancy.

■ Lastly, defendants say that there was no evidence of the premises having been used in providing sexual contact for pay and/or unlawful prostitution activity. The evidence above recounted shows that there was sexual contact, paid for by Berkland at least, in accordance with the statutory definition. Carolyn Duncan admitted engaging in 50 or 60 acts of prostitution while she was present at the massage parlor. The evidence of substantial income shows that pay was received for the treatments, including genital contact. The trial court did not err in so finding.

■ Some mention should be made as to defendant, David Jackson's, status, although the injunction as to him is not presented as a point. Allusion in Point I is made to the fact that he purchased the property from other defendants in November, 1984. Jackson had received a license to operate a health studio providing massage. He acknowledged that he had been told that the VIP was closed, and that it had been raided for alleged prostitution activities. The trial court did not err in finding that Jackson was not a buyer in good faith, and extending the injunction as to him as a defendant.

These fairly recent cases indicate judicial concern for abating as public nuisances masturbatory massage parlors under regulatory statutes and ordinances similar to § 567.080, supra: *City of Chicago v. Geraci*, 30 Ill.App.3d 699, 332 N.E.2d 487 (1975); *City of Chicago v. Cecola*, 75 Ill.2d 423, 27 Ill.Dec. 462, 389 N.E.2d 526 (1979); *Village of Bensenville v. Botu, Inc.*, 39 Ill.App.3d 634, 350 N.E.2d 239 (1976); Annot. 80 A.L. R.3d 1020 (1977).

The judgment is affirmed.

All concur.